**Foy R. PENDERGRAPH, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.**

**No. C-124-D-65.**

United States District Court
M. D. North Carolina,
Durham Division.

June 20, 1966.

George W. Miller, Jr., of Haywood, Denny & Miller, Durham, N. C., for plaintiff.

William H. Murdock, U. S. Atty., and H. Marshall Simpson, Asst. U. S. Atty., Greensboro, N. C., for defendant.

## MEMORANDUM OPINION

EUGENE A. GORDON, District Judge.

On July 17, 1964, the plaintiff filed an application for a period of disability and for disability insurance benefits under the provisions of §§ 216(i) and 223 (a) of the Social Security Act as amended, 42 U.S.C.A. §§ 416(i) and 423(a). He alleged that he became unable to work on November 17, 1963, because of "loss of hip joint". His application was disallowed on October 1, 1964, and on October 14, 1964, he requested that his application be reconsidered. On December 29, 1964, the plaintiff's request for reconsideration was denied. Thereafter, on March 3, 1965, the plaintiff requested a hearing, which hearing was held on April 21, 1965, before Hearing Examiner, J. C. Goodwin, Esq. On April 30, 1965, the Hearing Examiner rendered his decision holding that the plaintiff had not established that he has an impairment of such severity as to preclude him from engaging in any substantial gainful activity and denied him a period of disability and disability insurance benefits. Thereafter, the Appeals Council, on May 24, 1965, held that the decision of the Hearing Examiner was correct, thereby making such decision the final decision of the Secretary of Health, Education and Welfare. 20 C.F.R. § 404.951.

This action, seeking judicial review of the final decision of the Secretary, was commenced on July 22, 1965, following which the parties cross-moved for summary judgment.

As stated by the Hearing Examiner, the issues for decision are whether the plaintiff is entitled to disability insurance benefits under § 223(a) of the Social Security Act, 42 U.S.C.A. § 423(a), and whether a period of disability may be established under § 216(i) of that Act, 42 U.S.C.A. § 416(i). The issues are dependent upon specific findings as to whether during the effective period of the application, filed July 17, 1964, and while the special earnings requirement was met, the claimant was under a disability in that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration, and, if so, the beginning date of such disability.

The 1965 Amendments (P.L. 89–97) to § 223 of the Social Security Act, 42 U.S. C.A. § 423 redefined "disability" as:

"Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The differences in the standards need not concern the Court for as indicated, infra, the only question for decision is whether the plaintiff is able to engage in any substantial gainful activity, and he would otherwise meet the qualifications of either test.

The Hearing Examiner further correctly stated that the evidence must establish that the claimant was under a disability as defined by the Act beginning on or before October 1, 1964, for entitlement to disability insurance benefits and on or before October 17, 1964, for establishment of a period of disability.

The Hearing Examiner decided that the plaintiff was not entitled to the aforesaid period of disability and disability insurance benefits finding that:

"(1) The claimant sustained an injury to his left hip and pelvis on November 7, 1960, including fractures of the left femoral neck, pelvic fractures, and a comminuted fracture of the right proximal fibula and a fracture of the tibial spine in the right knee. All of the fractures have healed except the femoral neck which developed aseptic necrosis and was eventually replaced by a Moore prosthesis.

(2) Due to some resorption of the femoral neck, the prosthesis is now unsatisfactory and claimant has more than a 60% loss of use of his left hip so that he walks with a cane and limps markedly on his left leg.

(3) Due to his impairment the claimant is unable to return to his former work of operating a 'back hoe' or other heavy equipment or of working in concrete, setting forms, or doing other heavy manual labor.

(4) There are many forms of sedentary work in the Durham, North Carolina, area in which claimant could be employed and to perform which he has the physical and mental capacity. In addition to these jobs, the claimant could be trained by the Vocational Rehabilitation Division to perform other types of work within his residual capacities and the services of this Division are available to him.

(5) The jobs which claimant is now qualified to perform constitute substantial gainful activity within the meaning of the Social Security Act.

(6) The claimant was not under a 'disability' within the meaning of the Act at any time during the effective life of his application of July 17, 1964."

The sole issue before this Court is whether the decision of the Hearing Examiner (made the decision of the Secretary of Health, Education and Welfare by the action of the Appeals Council) was supported by substantial evidence. In Thomas v. Celebrezze, 4 Cir., 331 F.2d 541, 543 (1964) the prescribed standard for judicial review is clearly set out by Judge Sobeloff as follows:

"The prescribed standard for review, found in section 205(g) of the Act, 42 U.S.C.A. § 405(g) is as follows: ' * * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *.' Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The Secretary, and not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). If his findings are supported by substantial evidence, the courts are bound to accept them. Underwood v. Ribicoff, 298 F. 2d 850 (4th Cir. 1962). In short, the courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the 'record as a whole' to determine whether the conclusions reached are rational. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folsom, 257 F.2d 778 (3d Cir. 1958) * * * if * * * reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are * * * bound to decide against the Secretary. * * * In such a circumstance the courts are empowered

either to modify or reverse the Secretary's decision 'with or without remanding the cause for a rehearing.' 42 U.S.C.A. § 405(g)."

There are four elements of proof to be considered in making a finding of claimant's ability or inability to engage in any substantial gainful activity: (1) objective medical facts which are the clinical findings of examining or treating physicians divorced from their expert judgments or opinion as to the significance of these clinical findings; (2) The diagnosis or expert medical opinions of these physicians; (3) The subjective evidence of pain and disability testified to by claimant, and corroborated by claimant's family and neighbors; (4) the claimant's educational background, work history and present age. Underwood v. Ribicoff, 4 Cir., 298 F.2d 850, 851 (1962); Redden v. Celebrezze, 4 Cir., 361 F.2d 815 (decided May 12, 1966); Arrington v. Celebrezze, 252 F. Supp. 65, 67 (M.D.N.C.1965).

"For the purpose of making a finding of fact on this issue, the fact finder must recognize the obvious interrelation of these elements of proof. The objective medical findings may show more or less clearly the existence of certain clinically determinable physical * * * impairments. However, a recitation of objective, clinical findings will seldom show, without more, the over-all effect of these impairments on a particular individual. This is a matter of medical judgment to be decided with reference to the individual's general physical condition and the state of development of each of the defects." Underwood v. Ribicoff, supra, 298 F.2d at p. 851.

Therefore, considering these first two elements of proof together, the following is the medical evidence.

On November 7, 1960, the plaintiff was admitted to Watts Hospital, Durham, North Carolina, for injuries received when a "back hoe", a tractor-like implement with a ditch-cutting apparatus attached, overturned upon him.

The first medical record is an undated "Summary of Admissions" of the plaintiff to the said Watts Hospital, the diagnosis of his injuries being:

"Fracture, Neck, left femur
Fracture, right pubic bone
Fracture, right tibula
Multiple abrasions and contusions"

He was discharged on January 14, 1961.

Although there are others, the most important item of medical documentary evidence (and the only other one which will be discussed) are the "Progress Notes" regarding the plaintiff made by John Glasson, M.D., which notes cover the period from June 29, 1961, to October 8, 1964. Inasmuch as no dispute exists among medical professionals regarding the nature, extent of the plaintiff's affliction or the anticipated course of its development, the entries will not be treated *seriatim* but will be summarized.

On June 29, 1961, Dr. Glasson indicated that he examined the plaintiff, ascertained that the fracture of the left femur previously treated had not healed and that there was

" * * * some pain and spasm with any attempts at passive rotation or lateral motion of the left hip * * * "

Dr. Glasson advised admission to Watts Hospital for subtrochanteric osteotomy for insertion of a Jewett nail and iliac bone graft to the left femur.

On July 7, 1961, the recommended operation was performed and the plaintiff was discharged on July 23, 1961, and mobilized on crutches with no weight-bearing. On November 16, 1961, the plaintiff was instructed to begin partial weight-bearing with one crutch but on November 30, 1961, he began reporting pain with some swelling noticeable in the left ankle soon thereafter. In subsequent months, Dr. Glasson noted that his patient was continuing to report pain in the area of the left hip and expressed doubt as to whether the plaintiff would be able to return to heavy physical work.

On April 11, 1962, Dr. Glasson examined the plaintiff and noted that the

plaintiff had a limp due to a shortening of the left leg some three-fourths of an inch "as a result of the non-union of the fracture of the neck of the left femur and the result of the subtrochanteric osteotomy" and that he had reached maximal recovery.

The records indicate that Dr. Glasson's next examination of the plaintiff was on October 30, 1963, and that it indicated definite limitation of lateral motion and rotary motion of the left hip with the shortening of the left lower extremity having increased to one inch. An x-ray examination revealed "a definite aseptic nacrosis of the left femoral head." The plaintiff, at this time, had reported increasing pain. Dr. Glasson was of the opinion that the plaintiff should have a Moore prosthesis for the correction of the difficulty and in order to preserve flexion in the left hip.

On November 25, 1963, the plaintiff was admitted to Watts Hospital. The Jewett nail was removed from the left femur and an A. T. Moore prosthesis was inserted replacing the head of the left femur. He was discharged from Watts Hospital on December 6, 1963, and by January 3, 1964, was to begin partial weight-bearing, allowed to sit in a chair and to operate an automobile. Examinations and consultations which continued through May, 1964, indicated that the plaintiff was continuing to improve and was allowed to gradually increase his activity. Dr. Glasson noted that the patient continued to report some pain.

On July 6, 1964, the plaintiff returned to Dr. Glasson, indicated that he had returned to work but that he had developed a severe pain in his left hip and knee. An examination of the plaintiff indicated that:

"* * * the hip can be rotated through a range of motion from 130 to 180 degrees. External rotation is 0. Internal rotation is 20 degrees. He can be abducted for about 30 degrees. No adduction is possible. There is a one-half inch shortening of the left lower extremity * * *"

"X-rays of the pelvis and left hip reveal some settling down of prosthesis on the neck of the femur as compared with the x-rays made three months ago."

On July 13, 1964, an x-ray examination of the plaintiff revealed some resorption at the neck of the femur.

There is other documentary medical evidence but it adds nothing to that above considered.

Frank W. Clippinger, Jr., M.D., the Government-retained Medical Advisor, testified at the hearing regarding the plaintiff's condition. He had not examined the plaintiff, but testified that he had an opportunity to examine the entirety of the medical records in the case and had the opportunity to view the plaintiff at the hearing.

Dr. Clippinger's replies to questions propounded by the Hearing Examiner in regard to plaintiff's present condition and prognosis bear quoting in some detail:

"Q. Dr. Clippinger, I would like to ask you * * * if the medical evidence in this case shows a condition which would be painful continuously to the claimant even though he is sitting.

A. It shows the condition could.

Q. Is that the usual thing or not?

A. To some degree it is usual. To a certain degree it is unusual.

Q. Can this condition be corrected by any further operation in your opinion, or improved?

A. Well, the salvage procedure is generally, following the failure of the procedure that was described here, is removal of this prosthesis, this metal part that was put into the hip, in an attempt to get rid of the pain. It does so at the expense of stability and makes the extremity that is difficult to bear weight on because of stability, but sometimes with less discomfort.

Q. In other words, to get rid of the pain he would probably not be able to use it for walking?

A. That is correct.

Q. And would he be required to walk on crutches perhaps?

A. Yes, sir.

\* \* \* \* \* \*

Q. Is it possible to fuse a hip of this type?

A. It is possible. It is difficult and the failure rate is relatively high.

Q. What if the prosthesis is put on instead of the terminal head, is it then feasible to fuse the hip?

A. It is possible, but it is, as I said, *a probable failure.*

Q. Would that relieve the pain?

A. If a solid fusion was obtained, it should relieve most, if not all, the pain, yes.

Q. Would he be able to bear weight on it?

A. I would expect.

Q. *Without any operative procedure would the condition of his hip be expected to improve any, or to deteriorate?*

A. \* \* \* *I would not expect it to improve. I would expect it to deteriorate gradually.*

Q. In its present condition, would it be your opinion that the claimant could or could not tolerate a sitting job which required him to sit all day?

A. Assuming the problem to be mechanical, as I understand it, he would have difficulty doing any one thing for a prolonged period of time, sitting, lying, standing. This is the kind of situation that needs to be moved occasionally."

(Emphasis supplied)

Dr. Clippinger then indicated that movement or activity would not aggravate the plaintiff's condition from a mechanical standpoint.

On cross-examination by plaintiff's counsel, Dr. Clippinger indicated that it would be possible to fuse the hip (i. e. to make the thigh bone grow with the hip bone) but that the procedure is fraught with failure because:

" \* \* \* following the removal of the head and neck of the femur there is sufficient stock loss that it is difficult to get the remainder of this thigh bone to unite, there is not much material here to use, and would create sufficient shortening if this was brought up closely enough to get good material that this would create as much a problem as the non-union would."

Dr. Clippinger then stated that in addition to the plaintiff's other difficulties, the hip joint had itself become arthritic and that the pain therefrom could be expected to increase.

On the question of subjective evidence of pain and disability, it is unnecessary to consider the course of the development of pain and disability prior to the removal of the Jewett nail and the insertion of the A. T. Moore prosthesis in its place, not because such were inconsequential, but because the Court is concerned only with the most recent suffering and disability of the plaintiff and as it regards his present and anticipated ability to engage in substantial gainful activity.

The plaintiff summarized his present condition:

" \* \* \* I can't do no walking or bend, (sic) or nothing, on that order, and it hurts all the time."

In reply to questions propounded by the Hearing Examiner, the plaintiff described his condition as follows:

"Q. You say you are having difficulty now?

A. Yes, sir, it hurts all the time. My knee hurts. It's shorter than my other foot and walking somehow causes the leader to hurt all time, too.

Q. Does it hurt you more at one time than another, that is, does the weather or anything like that affect it?

A. Well, not necessarily. It hurts me when I'm up on it more, and I get and sit up like this more. What I mean it hurts sitting up like his so bad I have to lay down for a while and it'll sorta ease off and then I get up a

while and it will start back hurting real bad again.

Q. Does it hurt worse when you walk on it, stand on it?

A. Yes sir. I can't do no * * * I can't walk to amount to nothing.

Q. But you can sit?

A. I can't set (sic) no long period of time. It gets hurting so bad I have to get up and lay down, get stretched out and it'll stop hurting.

Q. Do you take any medicine?

A. I take BC's and aspirins.

Q. How often do you take those?

A. I might take 4 or 5 BC's a day.

Q. Do they give you any relief?

A. It might for a little while but it'll start back up again.

Q. Then do you take another one?

A. Well, sometimes I do, but most of the time it start back and maybe in a hour I go lay down a while and it will stop hurting."

Detailing an average day's activities, the plaintiff indicated that he arose about 7:00 A.M., partook of breakfast and then sat upon the couch. As he described it:

"I might sit there a half hour then get up and walk around in the house some and go back and set (sic) down some more. Then I get to hurting, maybe in a couple hours I have to go back and lay down and lay down for a half hour or three-fourths of an hour."

The balance of the morning appears to have been passed by the plaintiff in the same way.

The plaintiff then indicated that he was unable to do any house work or take care of his yard. His mobility on his feet, he testified was limited to walking about his house as he indicated and some short walking in and about his yard. A cane was necessitated for any walking. "* * * about a hundred feet. That about as far as I ever walk." He further testified that he was able to operate his 1960 Ford automobile which has a manually operated transmission only by using his hand to lift his foot off and onto the clutch but can drive only eight or nine miles before the onset of pain makes further travel impossible.

The plaintiff stated that he could stand for no more than twenty or twenty-five minutes at a time and that he was suffering pain in his hip while occupying the chair in the hearing room. He indicated that the normal course followed to alleviate this pain would be "lay down for a while" and that this would reduce the pain.

The plaintiff also described the pain in his left knee occasioned by the shortening of his left leg thus placing stress on the left knee. The discomfort was reduced and his mobility increased by the wearing of a special shoe.

As to his work experience, education and age, the plaintiff is forty-two years of age. Although some conflict exists as to the exact extent of his education, the plaintiff testified at the hearing that he "completed" the tenth grade of high school or as he phrased it:

"Well, I went through the tenth, but back when I was in school I didn't learn enough to get by on and I never used nothing to amount to, and there wasn't much I ever learned."

The plaintiff was twenty-one years of age when he stopped school, having failed the first, fourth and eighth grades. Thereafter, he was not the recipient of any vocational training nor has he been taught any trades or specialized skills.

The plaintiff was first employed by an ammunition plant in Tarboro, North Carolina. At this job, the plaintiff worked in what was referred to as the "press room" where, according to his testimony before the Hearing Examiner, he counted the number of pellets of gun powder which were placed into the "Projector" and carried a tray of shells from one part of the press room to another. Exhibit 11, a "Report of Contact" with the plaintiff by a Claims Representative of the Social Security Administration dated August 20, 1964, indicates that the plaintiff operated the machine which ac-

tually loaded the shells and inserted the firing pin therein. From the entirety of the record, the latter operation was apparently performed by another to whom the plaintiff carried the tray of shells. The plaintiff, before the Hearing Examiner, specifically stated that he operated no machinery.

In 1945 the plaintiff entered the Army where he remained until 1946. He was assigned to the Corps of Engineers and was engaged in the building of bridges, the cutting of right-of-ways, repairing of houses, etc. He operated no machinery and exercised no particular skill and did only manual work, chiefly carpentry.

On his return from military service, the plaintiff farmed with his father from 1946 to 1948. They cultivated some fifteen acres, the chief crop being cotton. From 1948 until 1952, the plaintiff was employed by Erwin Cotton Mills in West Durham where he "laid up roping" in the Spinning Room as well as sweeping floors and "oiling bands." Apparently, although there again seems to be some conflict between Exhibit 11 (the aforesaid "Report of Contact") and the plaintiff's testimony before the Hearing Examiner, this job consisted of placing of balls of yarn on the top of the spinning frame where it was converted into thread.

Since 1952, the plaintiff has been engaged in construction work, the nature of the work being described by the plaintiff as:

> "Doing concrete work, form work, pushing the wheelbarrows, digging ditches, doing anything that came to hand."

In other words, in addition to operating the "back hoe", the implement which caused his injury, the plaintiff performed many of the very strenuous unskilled tasks in connection with the pouring of concrete with emphasis on the making of the forms.

There are two items of evidence which cannot conveniently be compartmentalized in the categories of evidence set forth above. Following an examination

by several doctors at the Veterans Administration Office in Winston-Salem, North Carolina, the plaintiff was found to have a 100% non-service connected disability and was awarded the sum of $80.00 per month. He was awarded benefits under Workman's Compensation of $35.00 per week for 120 weeks under the provisions of the General Statutes of North Carolina, § 97–1, et seq.

■ Although such a determination is not binding on the Hearing Examiner who must make an independent determination on the question of whether the plaintiff is able to engage in any substantial gainful activity, Johnson v. Flemming, 188 F.Supp. 447, 450 (D.Ore. 1960); Hayes v. Celebrezze, 5 Cir., 311 F.2d 648, 653 (1963), the employment of the words "not *determinative*" in the Social Security Regulations, 20 C.F.R. § 404.1525, plainly implies that if such a finding by another agency is not *determinative* of the issue then it is to be given *some* weight, Fowler v. Celebrezze, 222 F.Supp. 609, 611 (W.D.N.C.1963); Mischler v. Celebrezze, 227 F.Supp. 754, 756 (E.D.La.1964) and must be considered along with the other evidence, Stoliaroff v. Ribicoff, 198 F.Supp. 587, 590 (N.D.N.Y.1961). The Hearing Examiner at the least, should have evaluated the standards by which the plaintiff was granted the compensation he claimed before such other agency to determine the significance of those standards. Hayes v. Celebrezze, supra, 311 F.2d at p. 654; Smith v. Gardner, 251 F.Supp. 262, 268 (M.D.N.C.1966).

■ That the plaintiff is unable to return to his former employment is unquestioned. The Hearing Examiner, amply supported by substantial evidence found that he:

> " * * * is unable to return to his former work of operating a 'back hoe' or other heavy equipment, or working in concrete, setting forms, or doing other heavy manual labor."

The record must, therefore, contain substantial evidence of what jobs which constitute "substantial gainful activity"

the plaintiff is now able to perform and whether or not such jobs are available to him in order to support a denial of a period of disability and disability benefits. Ray v. Celebrezze, 4 Cir., 340 F.2d 556, 559 (1965); Lambert v. Celebrezze, 4 Cir., 361 F.2d 677 (decided May 12, 1966); Tigner v. Gardner, 5 Cir., 356 F.2d 647, 651 (1966); Alsobrooks v. Gardner, 5 Cir., 357 F.2d 110 (1966); Slone v. Gardner, 6 Cir., 355 F.2d 485, 487 (1966).

■ Any such finding must be made against the background of uncontested evidence that the plaintiff is afflicted with pain which, by undisputed medical evidence, can be expected to intensify as the plaintiff increases in age, who cannot stand or sit for any length of time, who must have frequent recourse to bed rest during the day as a means of alleviating his pain, who cannot bend, who can walk only short distances and then only with a cane and with difficulty, who possesses limited formal education and is possessed of no specialized trade, skill or occupational training and who is, in addition, afflicted with a speech impediment, who is forty-two years of age and whose work history consists solely of unskilled manual labor.

The only evidence which would appear to support the finding of the Hearing Examiner is that of Dr. Robert H. Ballantyne, a government retained vocational expert. His testimony is, therefore, of great importance and is considered at some length. To Dr. Ballantyne, the Hearing Examiner propounded the following questions:

"Q. Dr. Ballantyne, assuming that I should find this claimant has a condition in his left hip which requires him now to walk with a cane; that he cannot tolerate any prolonged standing, walking or prolonged sitting; that if he is employed in any job he would have to be employed in one that permitted him to get up and move about, change his position frequently; that he has no other impairment to the use of his other limbs, his hands, his arms, right leg; *that he has no other physical inhibitions for any particular type of job*; but considering this limitation and his age, his education, and his apparent intelligence as shown by his school record, as well as his testimony here today, any observations you have made, his industrial background, I will ask you if you have an opinion whether he could be employed in *some type of work* located in or near Durham, North Carolina?"
(Emphasis supplied)

This hypothetical question is an inadequate statement of both fact and law in that (1) it ignores the fact that the plaintiff must frequently rest in bed to relieve his pain; (2) it ignores the plaintiff's speech impediment; and (3) it refers to "some type of work" rather than "substantial gainful activity."

"A. Well, *using the assumptions that you have outlined,* and examining the record as it was sent to me, although other than this morning I haven't had an opportunity to observe the claimant in the case, I do have an opinion * * *. In my review of the material, and thinking about the types of occupations that might be available in the community, I was not concerned with whether or not there are vacancies in the occupations, in other words, there is a particular vacancy at a particular plant at a particular moment.

Q. No, I'm not speaking of that. I just want to know if there were a vacancy if he could perform a job.

A. Yes, sir. In trying to analyze the work situation in the kinds of occupations that he could be qualified for, I consulted two basic works. One of these is the Dictionary of Occupational Titles, and the other is entitled The Estimates of Worker Trait Requirements for 4,000 Jobs. Both of these publications are put out by the Department of Labor and are very useful in establishing a standard in terms of the nature of the job and also what physical requirements are involved. Also in preparation for this, I discussed with representatives of the

personnel departments of several industries in the Durham area, and without identifying the claimant by name, but giving a very general description of his condition, getting their opinion as to whether or not there were positions in their various plants that he might perform. In examining the list initially, I considered only occupations that were characterized as sedentary in nature. That is, all other types of occupations were ruled out. This particular classification is defined in the Worker Trait Requirements as lifting no more than 10 pounds maximum, and it is defined as one which involves sitting. It may involve a certain amount of walking and standing, but these are required only to get from one place to another and are normally not considered to be the major characteristic of the job. It is normally to be considered a sitting type of position. From the testimony that has been offered I think it should be pointed out that most occupations do provide for coffee breaks, restroom breaks, in other words, other time within normal each hour, a period of hours, according to how you get around. There are many jobs depending in nature. This is taken into consideration so that several people would spell each other so that they can have a break from the routine * * *. Now with this type format this Worker Trait Requirements for 4,000 Jobs was examined. From that list I did identify a certain number of positions which can be expected to be found in this community where this claimant, from the evidence that has been presented, can be expected to perform. * * * A two-page sheet with some 20 or 30 positions." (Emphasis supplied)

█ Excessive reliance on the Dictionary of Occupational Titles and Estimates of Worker Trait Requirements and the capsule descriptions of jobs contained therein, has been repeatedly condemned. Ray v. Celebrezze, supra, 340 F.2d at p. 559; Cyrus v. Celebrezze, 4 Cir., 341 F.2d 192, 196 (1965) and if nothing more appeared there would clearly be a lack of substantial evidence to support the findings of the Hearing Examiner. In the present case the vocational expert made some further investigations, the extent of which is fully indicated in his cross-examination by the plaintiff. Reference had been made to the aforesaid list of "some twenty or thirty positions" prepared by the Vocational Expert "which can be found in this community" and which the plaintiff "can be expected to perform:"

"Q. Now are you saying, Dr. Ballantyne, that you made inquiry concerning each one of the job catagories that you have outlined in these exhibits?

A. No sir, not in this particular case, I did not. I have talked with people about many of these positions in the past. As an example, the position of egg candler, people are employed in this particular position according to the information I have received prior. I haven't checked on this in 4 to 6 months.

Q. Are you personally familiar with the type of movement in the operations required of a person to go through all the job positions that you have outlined here?

A. Well, sir the only way I can really * * * No I have not been able to actually observe each one of these individuals in operation. The only thing I can do is utilize the kind of information that is generally agreed upon as presented in the various kind of documents of evidence.

Q. You have here on this exhibit a handle boy job position. Do you know what this is?

A. Yes sir. I will have to refer * * *. I can read you the definition as found in the Dictionary of Occupational Titles located on page 639. This particualr job is classified by DOT Code Title of 8–62.–1—Attaches handles to ladies pocketbooks by inserting open rings in the pocketbook frames, slipping the handle into the rings and

closing the rings with nippers. *This particular position, in Durham there is a company that specializes in leather.* To a certain extent leather manufacturing and also leather preparing * * *.

Q. Let me get straight just where this information came from. Did you go from records to the various industries, concerns in the locale, when you refer to a manual as to the various job classifications? Is that correct? Is that how you arrive at this information?

A. Sir, approximately some 40,000 different job classifications, job titles, so the easiest way to break this down in some manageable fashion, there are two ways, as a matter of fact, one is to use the Worker Trait Requirements which deals with over 4,000 jobs; and secondly is that again you try to break this down to the kind of industries that are available in the community.

Q. Alright, sir. Now when you called each one of these by telephone * * * and how many did you actually contact?

A. *As I indicated before, I did not contact every one.*

Q. Dr. Ballantyne, how many did you actually call by telephone?

A. *For this particular case I called only three industries. Prior to this time I have talked with many of the other industries.*

Q. Any that you called this time, any of three, did any of the three advise that they could not use a man such as you described?

A. In all cases, sir, in describing this situation they said at the current time they had people who had *some type* of handicap who were employed. *I think it should be pointed out that in most of these cases industries are rather paternal in their approach to their employees and many of these people are in positions but the individual has been employed by the firm for a period of time when he did not have the handicap. He suffered a handicap or* some kind of injury off the job, or perhaps even on the job.

Q. And oftimes the employer makes special dispensation in such a situation?

A. Yes.

Q. Did you outline to these people that you called the occupational history that you have on this biographical schedule one, two, three, four, five, six, seven items?

A. I did not enumerate each job in particular, but simply described the individual as one who had not completed high school. *At the time I did not know though that he had as much difficulty with his speech.* But most of the jobs come under * * * had been under the general labor category.

Q. Alright, sir. Now when you talked with these people did you outline to them his medical history you have indicated on this biographical study?

A. Yes.

Q. I do not see here any indication that he is required to walk with a cane for assistance. I ask if that would not be a factor that the employers would consider.

A. Well, I'm sure they would consider this. However, the jobs were, or at least characterized, by not requiring a great deal of movement; and yes I'm sure the employers would consider this, any type of walking aid in their evaluation. Yes I am sure they would, but the jobs necessarily are not concerned with it. As an example, a type position, cashier, there are more and more places, car washes for example, where cashiers are required. No movement is really involved. You sit on a stool or stand and simply collect the money as it comes through. Although I am sure that the employer would be affected by the kind of appearance a man made when he applied for a job."

(Emphasis supplied)

█ It need not be shown that a particular employer has a job available for

the claimant, Wimmer v. Celebrezze, 4 Cir., 355 F.2d 289, 293 (1966) but the procedure employed by the vocational expert in determining the extent of employment opportunities suited to the plaintiff is little better than relying on texts alone.

Even assuming that the plaintiff met the first of the two-fold tests, i. e., he is able to perform the jobs indicated on page 3 of Exhibit 23, with the exception of three jobs listed therein and one other about which Dr. Ballantyne testified at the hearing, he was unable to state whether those jobs actually existed in the Durham area at the time of the hearing. At least one, that of egg candler had not been checked in the last "four to six months" and the position of "handle boy" he only assumed to exist because Durham had a "company that specializes in leather." Other than the four industries Dr. Ballantyne contacted, there is no proof that the multitude of positions listed in Exhibit 23 actually exist in Durham at the time of the hearing.

In regard to the four positions personally checked by Dr. Ballantyne and to the officials of which he described the plaintiff's condition and assuming that he had given those officials the entirety of the information regarding the plaintiff contained in Exhibit 23, and he testifies that he did not, and that the industries would employ persons with handicaps more or less similar ("some type of handicap" was the phrase employed by the Vocational Expert) to that of the plaintiff (his testimony adds generality to generality); nevertheless, the value of such testimony is immediately nullified by the statement that many of such handicapped individuals in such positions were old employees, employed before they were injured and toward whom the industry looked paternally and made special dispensation.

Such could not, therefore, constitute substantial evidence of work the plaintiff is capable of performing in his locality even if the vocational expert's investigation was not otherwise fatally incomplete. Exhibit 23, the contents of which was assumedly imparted to the employers contacted contains no mention of the fact that this particular claimant must take bed rest at frequent intervals to relieve his pain, that he walks only with a cane and that he has a speech impediment which Dr. Ballantyne acknowleges is more severe than he had imagined.

There is no evidence that any employer would hire a person of the plaintiff's abilities and training who could not work for more than an hour or two without having to go to bed to relieve the stresses bearing on his hip. As the Court indicated in Thomas v. Celebrezze, supra, 331 F.2d at p. 546:

> "Employers are concerned with substantial capacity * * * and steady attendance; they will not unduly risk increasing their health and liability insurance costs. It is unrealistic to think they would hire anyone with the impairments of this claimant."

The plaintiff is certainly not helpless and can certainly perform some tasks but the statute provides that he is entitled to disability benefits and a period of disability unless he is able to perform, "substantial gainful activity," 42 U.S.C.A. § 423(c). The ability to vend pencils or apples on a street corner is not such. Thomas v. Celebrezze, supra, at p. 546.

Although the courts are not to interpret the Social Security Act so broadly as to equate it with unemployment compensation, Celebrezze v. Sutton, 8 Cir., 338 F.2d 417, 422 (1964); Richard v. Celebrezze, 247 F.Supp. 183, 185 (D.Minn.1965), the Act is nevertheless to be construed liberally, Bradey v. Ribicoff, 4 Cir., 298 F.2d 855, 858 (1962), cert. den. 370 U.S. 951, 82 S.Ct. 1601, 8 L.Ed.2d 817 (1962), cert. den. sub nom. Heath et al. v. Celebrezze, 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); Celebrezze v. Bolas, 8 Cir., 316 F.2d 498, 500 (1963); Rodriquez v. Celebrezze, 1 Cir., 349 F.2d 494, 496 (1965); De Gracia v. Secretary of Health, Education and Welfare, 248 F.Supp. 522, 526 (D.P.R.1966). In this case, no extraordinary liberality is required.

The only question is whether the decision of the Secretary is supported by substantial evidence, Williams v. Celebrezze, 4 Cir., 353 F.2d 74, 75 (1965); Ollis v. Ribicoff, 208 F.Supp. 644, 645 (W.D.N.C. 1962), and it is not.

The Court, therefore, finds as a fact that by the record as a whole the plaintiff has been unable to perform any substantial gainful activity by reason of a medically determinable physical impairment which can be expected to result in death or be of a long-continued or indefinite duration and that the record is barren of substantial evidence to the contrary. It follows that the motion of the defendant for summary judgment should be denied and the motion of the plaintiff for summary judgment should be granted.

An order will be entered remanding the case to the Secretary of Health, Education and Welfare with the direction that the plaintiff be granted the period of disability and disability insurance benefits to which he would have been entitled had his application of July 17, 1964, been approved.